**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 10-00376-3 JSW |
| v. | **ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND SETTING STATUS HEARING** |
| OSHAN COOK, | |
| Defendant. | |

## INTRODUCTION

This matter comes before the Court upon consideration of the Motion to Suppress filed by Defendant, Oshan Cook ("Cook"). The Court has considered the parties' papers, including their supplemental briefs and evidence, relevant legal authority, the record in this case, and it has had the benefit of oral argument. The Court concludes that an evidentiary hearing is not warranted, and the Court DENIES Cook's motion.

## BACKGROUND

Cook is charged with one count of conspiracy to possess with intent to distribute and to distribute 3,4-Methylenedioxymethamphetamine ("MDMA"), two counts of possession with intent to distribute MDMA, and one count of possession with intent to distribute LSD. (Superseding Indictment.) These charges stem from his arrest, on April 22, 2010, as part of an undercover buy/bust operation conducted by the Drug Enforcement Agency ("DEA").[1] The

---

[1] In his motion, Cook did not argue that the DEA lacked probable cause to arrest him. However, in response to one of the Court's questions at oral argument, he advised the Court that he had received discovery that led him to believe the DEA did not have probable cause to arrest him and that might necessitate an evidentiary hearing. In light of that argument, the Court directed the parties to file supplemental briefs and evidence on

events leading up to the arrest began on April 21, 2010, when a confidential source ("CS") introduced DEA Special Agent Jay Dial ("SA Dial") to Cook's co-defendant Victoria VanLaanen ("VanLaanen") to arrange the purchase of MDMA. (Docket No. 159-1, Declaration of Doron Weinberg ("Weinberg Decl."), Ex. A (4/21/10 Report of Investigation ("4/21/10 ROI"), Synopsis, Details ¶ 2).) SA Dial and the CS picked VanLaanen up at a hotel in San Francisco, and she directed them to head to Oakland while she called "Yuri," later identified as co-defendant Yuri Lambert ("Lambert"). (4/21/10 ROI, Details ¶¶ 3, 7.) A man answered VanLaanen's call and directed them to the Nomad Café in Oakland, which was located at 65th and Shattuck. Lambert then called VanLaanen, and, after that call ended, VanLaanen told SA Dial that Lambert's guy would be there with the drugs and that they expected to do the transaction that day. (*Id.*, Details ¶ 4.) SA Dial advised VanLaanen that he did not have the money with him and that he had just planned to meet Lambert to get to know him. VanLaanen suggested that SA Dial would have to work those issues out with Lambert. VanLaanen also stated that "'he' had it since nine o'clock last night." (*Id.*)

SA Dial advised VanLaanen that he would be able to conclude the transaction the next day, and VanLaanen said she would get Lambert and bring him back to the car. The CS and VanLaanen exited the vehicle, and a short time later the CS returned and advised SA Dial that Lambert was on his way. SA Dial then observed VanLaanen and Lambert walking to the car. VanLaanen introduced Lambert and left. SA Dial said he did not know what was said or what was going on, and Lambert responded that he had his buddy with him and was ready to go. (*Id.*, Details ¶¶ 5-7.)

SA Dial advised Lambert that he was not ready to do the transaction that day and reiterated what he told to VanLaanen, that he had wanted to meet Lambert first, but that he would be ready to do the transaction the next day. When Lambert asked what time SA Dial wanted to conduct the transaction, SA Dial said at about 1:00 p.m. Lambert and Dial then confirmed the quantity of MDMA involved, three pounds, and the price, $18,000 per pound. SA Dial stated that he wanted to do the transaction in a public place, and Lambert suggested the

this issue.

2

parking lot of a Whole Foods grocery store nearby. SA Dial said he would go to VanLaanen to set up the deal. (*Id.*, Details ¶¶ 7-8.)

SA Dial also asked Lambert who his buddy was, and Lambert responded "James." SA Dial asked if James would be willing to meet him then, and Lambert said he might but that James already had the "stuff (drugs)" on him and indicated he might be nervous. SA Dial and Lambert went over the cover story about how they knew one another, and they left SA Dial's vehicle and approached the Nomad Café. (*Id.*, Details ¶¶ 9-10.) Lambert introduced SA Dial to James, later identified as co-defendant James Edmonds (hereinafter "Edmonds"), and Lambert told Edmonds that SA Dial did not have the money with him but that SA Dial wanted to do the deal tomorrow. SA Dial apologized for the miscommunication and assured Edmonds that he would have the money the next day and they could conclude the deal then. When SA Dial asked if that would be a problem, Edmonds responded that he was not sure and would have to contact his people. (*Id.*, Details ¶ 10.) SA Dial also stated that he was sure Edmonds did not want to hold on to "it" any longer, and Edmonds stated that he did not. SA Dial told Edmonds that he would contact Lambert when he had the money. SA Dial, the CS and VanLaanen then returned to SA Dial's vehicle and left.[2] VanLaanen told SA Dial that Edmonds had the drugs on him. SA Dial drove VanLaanen back to San Francisco and dropped her off in the North Beach area of the city. (*Id.*, Details ¶¶ 10-11.)

The next day, April 22, 2010, DEA Special Agents and Task Force Officers, including Task Force Officer Knight ("TFO Knight") conducted surveillance of a house located at 590 63rd Street, Oakland, California, which was listed on Lambert's driver's license as his residence. (4/21/10 ROI, Details ¶¶ 7, 10; Weinberg Decl., Ex. B (4/26/10 ROI, Details ¶ 4); Declaration of Task Force Officer Robert Knight ("Knight Decl."), ¶ 2.) At around 11:30 a.m., one of the Special Agents observed a red vehicle, later determined to have been rented to Cook, arrive at the house. Agents observed a white male, later identified as Cook, exit the vehicle and enter the house with a large backpack. According to DEA Special Agent Dave McTeer and TFO Knight,

---

[2] VanLaanen had advised SA Dial that Lambert did not want to meet the CS, and it is not clear whether the CS was present at any of the discussions between Edmonds, Lambert and SA Dial.

3

when Cook left the house a short time later, the backpack "appeared less full than before." (4/26/10 ROI, Details ¶¶ 6, 8; Knight Decl., ¶ 3.)

Thereafter, agents observed Lambert and Edmonds leave the house. Edmonds was carrying a black round container. (4/26/10 ROI, Details ¶ 10; Knight Decl., ¶ 4.) Edmonds and Lambert proceeded to the Whole Foods parking lot and a nearby Chevron station, where VanLaanen and SA Dial were waiting. Special Agents observed Edmonds and SA Dial enter SA Dial's car with the container, and they observed Lambert and VanLaanen walk away. SA Dial then gave a prearranged signal, and agents arrested Edmonds, Lambert and VanLaanen. (4/26/10 ROI, Details ¶¶ 11-14.)

Edmonds was interviewed after his arrest. (Docket No. 175-1, Supplemental Declaration of Doron Weinberg ("Weinberg Supp. Decl."), Ex. A (Interview of James Randall Edmonds ("Edmonds Interview")); 4/26/10 ROI, Details ¶14.) Edmonds eventually told the Special Agents that his source for the MDMA was "Oshan," later identified as Cook. (Edmonds Interview, ¶ 4; 4/26/10 ROI, Details ¶ 15.) The Special Agents asked Edmonds to call Cook to coordinate payment for the MDMA, and Edmonds told them he was supposed to call Cook by a landline telephone and that the number was at Edmonds' house. (Edmonds Interview, ¶ 5.) Lambert also was interviewed that day, and he told agents that a person who matched Cook's description had dropped off the MDMA to Edmonds that morning at approximately 11:30 a.m. Lambert also stated that Edmonds did have the MDMA with him on April 21, but that he believed Cook had retrieved it from Edmonds when the transaction did not go forward. (Declaration of Chinhayi Coleman Cadet, Ex. 1 (Interview of Yuri Lambert, ¶¶ 2-3).)[3]

DEA Special Agents eventually brought Edmonds back to the house at 590 63rd Street in Oakland. When he was asked if there were drugs in the house, Edmonds advised the Special Agents that he had some powdered MDMA that he had received from Cook on another occasion. (Edmonds Interview, ¶¶ 6, 10.) Edmonds told the Special Agents how he met Cook

---

[3] Although the Court granted the United States' motion to file ROI containing this interview under seal, these facts are set forth in the Government's supplemental opposition.

4

and that he had been dealing illegal drugs with Cook "on and off for five years." (*Id.*, ¶ 11.) The Special Agents asked Edmonds to call Cook to confirm that the sale had gone forward. (*Id.*, ¶¶ 5-6.) Edmonds placed two calls to a telephone number, but no one answered. (*Id.*, ¶ 15; 4/26/10 ROI, Details ¶ 18.) A short time later, Edmonds received a phone call and the person on the phone stated that he would see Edmonds shortly. (Edmonds Interview, ¶ 15; 4/26/10 ROI, Details ¶¶ 18-19; *see also* Knight Decl., ¶ 5.) One of the Special Agents told Edmonds that they had seen Cook arrive at Edmonds' house earlier that morning, and that they had observed Cook drop off the MDMA. Edmonds "corrected" the Special Agents and told them that he had the drugs in his possession the entire time, and that Cook came to the house because he had wanted to discuss how the transaction would take place. (Edmonds Interview, ¶ 16.)

DEA Agents and Task Force Officers then observed Cook approach the residence, and they arrested him. (4/26/10 ROI, Details ¶ 20; Knight Decl., ¶ 6.) According to TFO Knight, Cook wore what appeared to be the same black backpack he had worn earlier in the day. TFO Knight attests that for that reason he "believed that the backpack might contain evidence of drug trafficking." (Knight Decl., ¶ 6.) TFO Knight also attests that he "took Cook's backpack immediately when he was arrested," at approximately 3:40 p.m., and that he "immediately searched the backpack because [he] believed that the backpack may have held weapons and/or contraband." TFO Knight further attests that he conducted a "quick search" of the backpack to check for "destructive devices or other items that might pose an immediate danger," and that he did so within one to two minutes of Cook's arrest. Cook was face down on the ground at this point. (Knight Decl., ¶ 7; Declaration of Oshan Cook ("Cook Decl.") at 1:18-22.)

According to TFO Knight, he and his fellow officers left the area in front of the 63rd Street house in the event additional suspects arrived on the scene, and he placed the backpack in Cook's vehicle with another DEA Agent. TFO Knight attested that he observed that agent drive Cook's vehicle from the scene to a spot approximately one mile away. Less than 15 minutes later, TFO Knight and DEA Special Agent Jay Dial conducted a "thorough search of the backpack," and they discovered the evidence that Cook now seeks to suppress. (Knight Decl., ¶¶ 8-14, Exs. 1-3; Weinberg Decl., Ex. C (4/27/10 ROI, Details ¶¶ 2-3, Custody of Evidence

5

¶¶ 7-9.)[4]

## ANALYSIS

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated...." U.S. Const. amend IV.

**1.    Cook's Arrest Was Supported by Probable Cause.[5]**

It is undisputed that the DEA Special Agents and Task Force Officers did not have a warrant to arrest Cook. An officer has probable cause to make a warrantless arrest when "the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed ... an offense." *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990). A court looks to the totality of the circumstances known to the officers to determine whether "a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986); *see also United States v. Hartz*, 458 F.3d 1011, 1018 (9th Cir. 2006). An "arresting officer may rely on the collective knowledge of the other officers involved in the case," even if that information is not communicated to that officer. *United States v. Bertrand*, 926 F.2d 838, 844 (9th Cir. 1991).

---

[4]    In his declaration, Cook stated that he believed "approximately 30 minutes elapsed from the time" that he was initially restrained until the time he was driven away from the scene and that during that time he did not see any law enforcement officer open his backpack. (Cook Decl. at 1:24-2:1.) TFO Knight took photographs of Cook's backpack and of Cook at the time of the arrest. The time stamp on those photographs corroborates TFO Knight's declaration. Cook has not put forth any evidence to dispute the accuracy of the photographs. Thus, the Court concludes that this dispute does not give rise to the need for an evidentiary hearing.

[5]    Cook contends that there are disputed issues of fact on the issue of probable cause that require an evidentiary hearing. Specifically, Cook pointed to the fact that although SA Dial and TFO Knight emphasized that Cook's backpack appeared to be "less full" when he left Edmonds house on the day of his arrest, Edmonds had advised other Special Agents that the MDMA had been in his possession since April 21, 2010. Cook also cites to the discrepancy between what Lambert told the Special Agents who interviewed him and what Edmonds told the Special Agents who interviewed him. Although there is some dispute in the record about whether Edmonds returned the MDMA to Cook, in light of the other information that Edmonds provided to the Special Agents and their observations, the Court does not find that dispute to be material to the resolution of this motion. Cook also argues that the Government and TFO Knight failed to include this information with the opposition. The Court not find this information to raise issues of credibility that would require an evidentiary hearing.

6

In this case, Edmonds had advised the Special Agents who interviewed him that Cook had supplied the MDMA for the transaction that took place on April 22, 2010, and that Cook had fronted the drugs to him with the expectation that Edmonds would pay him back. (Edmonds Interview, ¶ 12.) In addition, Lambert told the Special Agents who interviewed him that a person who matched Cook's description had supplied Edmonds with the MDMA and that he had seen him at the house at 590 63rd Street on the day of their arrest. Finally, when Edmonds received a call from the person the Special Agents believed was his supplier, that person asked Edmonds whether it had worked out, and advised Edmonds that he was on his way over. Edmonds advised the Special Agents that the supplier would be there shortly and, thereafter, Cook arrived at the house. Even if Cook had not had the MDMA with him when the Special Agents first observed him at the house that day, the totality of the circumstances would give rise to a "fair probability" that Cook had supplied Edmonds with the MDMA used in the transaction on April 22, 2010. Therefore, the Court finds that the Special Agents had probable cause to arrest Cook without a warrant.

### 2. The Searches Were Lawful.

There are two searches at issue in this case. The first is the "cursory" search that TFO Knight conducted, which did not result in the discovery of any evidence. The second is the more thorough search, conducted approximately fifteen minutes after Cook's arrest and after he had been secured and separated from the backpack, during which TFO Knight and SA Dial discovered the evidence at issue. It is undisputed that neither TFO Knight nor SA Dial had a warrant to conduct these searches.

A warrantless search is "*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and citations omitted). The Government contends that the search was justified as a search incident to a valid arrest.[6] *See Arizona v. Gant*, 556 U.S. 332,

---

[6] The Government argued, in the alternative, that even if the searches were improper, it would have been "inevitably discovered" during the course of a routine inventory search of the backpack. (*See* Knight Decl., ¶ 15.) In light of the Court's ruling, it does not reach the Government's alternative argument.

7

129 S.Ct. 1710, 1716 (2009); *United States v. Chadwick*, 433 U.S. 1, 14 (1977); *United States v. Robinson*, 414 U.S. 218, 224 (1973); *United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010). In *Robinson*, the Supreme Court noted that the search-incident-to arrest exception "has historically been formulated into two distinct propositions. The first is that a search may be made *of the person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made *of the area within the control* of the arrestee." *Robinson*, 414 U.S. at 224 (emphasis added). The *Robinson* court also held "that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.* at 236.

In *Chadwick*, however, the Supreme Court clarified that

> [w]arrantless searches of luggage or other personal property seized at the time of an arrest cannot be justified as incident to that arrest ... if the "search is remote in time or place from the arrest" *or* no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Chadwick*, 433 U.S. at 15 (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)); *cf. Gant*, 556 U.S. __, 129 S.Ct. at 1716 (holding that search of vehicle and containers found therein not justified as search incident to arrest where "the arrestee has been secured and cannot access the interior of the vehicle").

Thus, under *Robinson* and its progeny, when law enforcement officers discover a personal effect on that person, the officers may search that item and the propriety of the search "does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Robinson*, 414 U.S. at 236. In contrast, under *Chadwick* and *Gant*, when law enforcement officers seek to search an item not immediately associated with the person, but which is in his or her area of immediate control, "[i]f there is no possibility that an arrestee could reach into the

8

area" the officers want to search, the exception does not apply. *Gant*, 129 S.Ct. at 1716; *see also Maddox*, 614 F.3d at 1049 (citing *Chadwick*, 433 U.S. at 15).[7]

Cook relies on *Gant, Maddox* and *Chadwick* to argue that the searches of his backpack do not fall within the search incident to arrest exception, because once he had been handcuffed and separated from the backpack there was no longer any possibility that he could access it. The Government argues that the search was reasonable, and it relies on a line of Ninth Circuit cases in which the court upheld searches of backpacks and other bags on similar facts. However, several of these cases are unpublished and all of them pre-date *Gant* and *Maddox*. *See, e.g., United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993) (bag in defendant's hand); *United States v. Roman*, 101 Fed. Appx. 700, 2004 WL 1379913 (9th Cir. June 21, 2004); *United States v. Dedrick*, 54 Fed. Appx. 481, 2003 WL 124512 (9th Cir. Jan. 15, 2003); *United States v. Bates*, 47 Fed. Appx. 477, 2002 WL 31119844 (9th Cir. Sept. 25, 2001); *United States v. McDowell*, 475 F.2d 1037, 1040 (9th Cir. 1973); *cf., United States v. Passaro*, 624 F.2d 938, 943-44 (9th Cir. 1980) (wallet); *United States v. Ziller*, 623 F.2d 562, 562-63 (9th Cir. 1980) (wallet).

Pursuant to *Maddox*, the Court applies a two pronged inquiry: (1) was the backpack within Cook's "'immediate control when he was arrested';" and (2) did "'events occurring after the arrest but before the search make the search unreasonable'?" *Maddox*, 614 F.3d at 1048 (quoting *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1991)) (hereinafter the "*Turner* test").[8] The Court finds that the answer to the first question of the *Turner* test is yes. The record demonstrates that TFO Knight took Cook's backpack from him as he was arrested and,

---

[7] It is evident from the court's analysis in *Maddox* that it follows the rationale of *Chadwick* and *Gant*, rather than *Robinson* and *Edwards*. Indeed, the *Maddox* court found *Robinson* to be "easily distinguishable from the case before us," because the key chain was not on the defendant's person. *Id.* at 1048 n.2; *but see id.* at 1052 (Smith, J. dissenting, noting that the officer took the keys from defendant's hand). For this reason, the Court finds its decision in *United States v. Hill*, 2011 WL 90130 (N.D. Cal. Jan. 10, 2011) to be distinguishable from the facts in this case.

[8] The Supreme Court has construed the phrase "the area within his immediate control" mean "'the area from which [a suspect] might gain possession of a weapon or destructible evidence.'" *Gant*, 129 S.Ct. at 1716 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

9

thus, it was within his immediate control. The Court finds that the answer to the second question of the *Turner* test is no. The record shows that TFO Knight conducted his initial cursory search of Cook's backpack within one to two minutes after his arrest, in the same location of the arrest. *Chadwick*, 433 U.S. at 15. Thus, the first search was not distant in time or space from Cook's arrest. Although Cook was facedown on the ground and secured, the Court does not find that fact to be dispositive. The Special Agents arrested Cook in a public, and apparently residential, area, and TFO Knight did state he searched the backpack out of concerns for officer safety. *Cf. United States v. Shakir*, 616 F.3d 315, 319-21 (3rd Cir. 2010) (upholding search of defendant's gym bag after he was handcuffed where defendant was in a public place, and declining to read *Gant* to preclude a search incident to arrest any time a suspect has been secured).

There is no dispute that after TFO Knight conducted his initial, lawful, search of the backpack, the Special Agents maintained uninterrupted possession of it. Thus, with respect to the second search, the Court concludes that it is lawful pursuant to the Ninth Circuit's holding in *United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir. 1983) ("[W]e hold that once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant.")

### CONCLUSION

For these reasons, the Court DENIES Cook's motion to suppress. The parties are HEREBY ORDERED to appear on January 5, 2012 at 2:00 p.m. for a status conference. If they believe the time between the date of this Order and January 5, 2012 should be excluded under the Speedy Trial Act, they shall submit the appropriate request to the Court.

**IT IS SO ORDERED.**

Dated: December 22, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE